IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DEVIN FLOYD,<br><br>    Plaintiff,<br><br>v.<br><br>SANTA CLARA DEPARTMENT OF CORRECTION, et al.,<br><br>    Defendants. | Case No. 22-cv-00750-CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

Michael Floyd sued various Santa Clara County law enforcement officers, as well as the County and several of its subdivisions, for alleged constitutional violations stemming from the events following Floyd's August 2021 arrest. Defendants move for summary judgment on all counts. For the reasons that follow, the Court **GRANTS** Defendants' motion in full.

**I.   BACKGROUND**

On this motion for summary judgment, the Court considers the parties' admissible evidence and resolves all factual disputes against the moving party. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 772–73 (9th Cir. 2002). The Court cannot consider unauthenticated or inadmissible evidence, even for the purpose of drawing inferences from that evidence. Id. at 773.

**A.   Events at Santa Clara County Main Jail**

San Jose Police Department officers arrested Floyd on the evening of August 18, 2021, and brought him to the Santa Clara County Main Jail. Third Am. Compl. at 8. Officers booked Floyd into the Main Jail at 11:45 p.m. Dundic Decl. (dkt. 106-8) ¶ 4.

Floyd names the following officers from the Main Jail as Defendants: Dung Tran, Robert Silos, Jeremy Hiles, Saul Agustin, Charles Stokes, III, Ryan Reyes, and Sergeant Vorpahl. Third Am. Compl. at 4, 7.

For most of the time that Floyd spent at the Main Jail, he was secured to a chair in the intake lobby. Id. ¶ 5; see generally Floyd Exhibits (dkt. 108-3), Ex. V1 (intake lobby camera footage), Ex. V2 (intake lobby camera footage).[1]  Officers escorted Floyd to a toilet twice during the four hours he spent in the intake lobby: once at 12:35 a.m. and once at 2:37 a.m. on August 19. Dundic Decl. ¶¶ 6–7; Floyd Ex. V1 at 15:40–25:50; Fernandes Decl. (dkt. 106-2) Ex. A (holding cell camera footage).

Floyd was transferred to the Elmwood Correctional Facility at 3:38 a.m. on August 19. Dundic Decl. ¶ 8. Floyd requested to use the telephone in the intake lobby once he had learned that he would be transferred—about thirty minutes before his transfer. Floyd Dep. Tr. (dkt. 106-1) at 95:23–96:16, 97:4–7, 103:21–24. The officers told Floyd that he needed to wait until after he arrived at Elmwood before he could make a phone call. Id. at 98:12–21. Floyd also requested to use the restroom as officers were escorting him to the van that would transport him to Elmwood, but the officers told him he could use the restroom there. Floyd Ex. V4 (body camera footage) at 0:00–3:00.

### B. Events at Elmwood Correctional Facility

Floyd arrived at Elmwood around 4:00 a.m. on August 19. Cote Decl. (dkt. 106-7) ¶ 4. Floyd was instructed to "dress out"—that is, change from his civilian clothes into prison clothes—before he could leave the processing lobby and go to his cell. Id. ¶ 7; Floyd Dep. Tr. at 128:18–21. He refused, stating that he needed to make a phone call first. Floyd Dep. Tr. at 128:22–24, 130:2–3; Cote Decl. ¶¶ 7–8, 10. Floyd persisted in his refusal to dress out for ten hours, even as multiple officers asked him to comply and

---

[1] Both parties rely heavily on video camera footage, yet Floyd repeatedly asserts in his briefing that the video footage has been altered. See Opp. (dkt. 108) at 2, 4, 11. Floyd does not back up these assertions with evidence, so they are not entitled to any weight. The video footage speaks for itself. See Scott v. Harris, 550 U.S. 372, 380–81 (2007). The Court also grants the motions to seal the video camera footage (dkts. 105, 108).

assured him that he would be able to make a phone call once he did.  Floyd Dep. Tr. at 130:12–132:8; Cote Decl. ¶ 8.  These officers included Defendants Gino Cofferati, Corey Evans, Yvette Dias, Bradley Reagan, Victor Cabrera, Kyle Quadros, Fabian Serrano-Alvarez, George Barajas, Jesus Patino, Joseph Cortez, Isaiah Campos, Ryan Hernandez, and Miguel Sanchez-Perez.  Third Am. Compl. at 4–7.  Over the course of those ten hours Floyd used the restroom twice, at 4:55 a.m. and at 8:23 a.m.  Cote Decl. ¶ 18; Floyd Dep. Tr. at 145:23–146:1.  The record does not indicate whether Floyd asked to use the restroom aside from those two occasions.

While Floyd was in the processing lobby, Defendants twice referred him for a mental health assessment.  Evans Decl. (dkt. 106-9) ¶¶ 4–5.  During the second assessment, Defendant Conseulo Garcia, a therapist, offered to call Floyd's brother.  Id. ¶ 5; Garcia Decl. (dkt. 106-10) ¶ 5; Floyd Dep. Tr. at 137:8–16.  Garcia initially reached Floyd's brother, but the call was disconnected, and Garcia was unable to reconnect.  Evans Decl. ¶ 5; Garcia Decl. ¶ 5.  Floyd did not ask Garcia to call anyone else for him.  Evans Decl. ¶ 6; Garcia Decl. ¶ 6.

At approximately 11:00 a.m. on August 19, the Emergency Response Team—a group of at least ten officers—went to the processing lobby to try to take Floyd to his cell.  Cote Decl. ¶ 8; Cabrera Decl. (dkt. 106-4) ¶ 4.  Floyd resisted by pulling away, tensing his extremities, refusing to walk, and otherwise making it difficult or impossible for officers to physically move him from his seat.  Fernandes Decl. Ex. B (handheld video camera footage), Ex. C (body camera footage); Ex. D (body camera footage); see also Barajas Decl. (dkt. 106-3) ¶ 5; Quadros Decl. (dkt. 106-11) ¶ 5; Patino Decl. (dkt. 106-12) ¶ 5; Evans Decl. ¶ 8; Serrano-Alvarez Decl. (dkt. 106-13) ¶ 5; Cabrera Decl. ¶ 5; Floyd Dep. Tr. at 143:3–6, 12–14, 144:8–12, 145:10–13.  Rather than force Floyd to move, ERT members resecured him to his seat and left.  Fernandes Decl. Ex. B, Ex. C; Ex. D; Barajas Decl. ¶ 5; Quadros Decl. ¶ 5; Patino Decl. ¶ 5; Evans Decl. ¶ 8; Serrano-Alvarez Decl. ¶ 5; Cabrera Decl. ¶ 5; Floyd Dep. Tr. at 142:20–22, 145:23–146:1.  Floyd suffered bruising from the handcuffs he was wearing at the time.  Floyd Dep. Tr. at 146:15–16, 152:20–25.

Ruth Cote, the watch commander at Elmwood, then went into the processing lobby to meet with Floyd. Cote Decl. ¶ 12. She told Floyd that he could not stay in the lobby, but he refused to dress out so he could be moved to his cell. Id. ¶¶ 13–14. Cote then decided that Floyd would have to be moved to his cell and dress out there, so she called the ERT back. Id. ¶ 15. Floyd did not resist this time around, and the ERT members were able to remove him from the lobby in a wheelchair. Fernandes Decl. Ex. E (processing lobby camera footage); Ex. F (body camera footage); Ex. G (body camera footage); Floyd Ex. V5 (processing lobby camera footage) at 55:20–57:30. The ERT members did not use force or injure Floyd on this occasion. Floyd Dep. Tr. at 151:6–11.

ERT members took Floyd to his cell, where he arrived around 2:00 p.m. Cote Decl. ¶ 17. Once in his cell, Floyd spoke with Defendants Matthew Newton and Daniel Dickson. Floyd Ex. V3 (body camera footage). They informed Floyd that there was a phone in the dorm but that he would have to wait his turn to use it. Id. at 5:40–6:15.[2]

### C. Procedural History

Floyd sued the 24 individual defendants under § 1983, alleging various theories of liability:

- He alleges that Defendants Barajas, Cabrera, Campos, Cortez, Dias, Evans, Hernandez, Patino, Quadros, Reagan and Serrano-Alvarez used excessive force against him. Third Am. Compl. at 5–6.
- He alleges that Defendants Agustin, Cofferati, Cote, Dias, Dickson, Evans, Garcia, Hiles, Newton, Reagan, Reyes, Sanchez-Perez, Silos, Stokes, Tran, and Vorpahl violated his right under California law to make a phone call. Id. at 4–7.
- He alleges that Defendants Agustin, Hiles, Reyes, Silos, Stokes, Tran, and Vorpahl violated his right to use the restroom. Id. at 4, 7.[3]

---

[2] Floyd asserts in his opposition brief that Dickson told him "[a]t some point while on duty" that "he would have to wait 24 hours for a phone call due to COVID." Opp. at 6. Floyd does not identify any supporting evidence for this assertion, and the Court has been unable to locate any.
[3] Floyd initially brought several of these claims under the Eighth Amendment. These claims should have been brought under the Fourteenth Amendment, because Floyd was a

4

1  Floyd also sued the County of Santa Clara (and several of its subdivisions, such as the
2  Department of Correction) for municipal liability under Monell v. Department of Social
3  Services, 436 U.S. 658 (1987).

## II. LEGAL STANDARD

Summary judgment is proper when there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where, as here, the moving party will not bear a burden of proof at trial, it need only point out "that there is an absence of evidence to support" the nonmoving party's case. Id. Once it has done so, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). If the nonmoving party fails to do so, "the moving party is entitled to a judgment as a matter of law." Celotex, 477 U.S. at 323.

## III. DISCUSSION

Floyd asserts three categories of due process claims, each of which stems from a distinct factual predicate: (1) an excessive force claim arising out of Defendants' first, unsuccessful efforts to move Floyd from the Elmwood processing lobby, (2) a claim arising out of Defendants' refusal to allow Floyd to use a phone at either the Main Jail or Elmwood; and (3) a claim arising out of Defendants' refusal to allow Floyd to use the

---

pretrial detainee. Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). Floyd's mistake is not itself grounds to enter summary judgment, however. See West v. Dallas Police Dep't, 1997 WL 452727, at *5 (N.D. Tex. July 31, 1995).

5

1  restroom at either the Main Jail or Elmwood.  Floyd's Monell claim incorporates these
2  three factual bases as well.

### A.  Excessive Force

Floyd's first batch of claims are against the ERT members who were involved in the first, unsuccessful effort to move Floyd from the Elmwood processing lobby to his cell. The Fourteenth Amendment grants pretrial detainees the substantive right to be free from excessive force. Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015).  Excessive force is that which amounts to punishment.  Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). Force that is reasonable given the "facts and circumstances of [the] particular case," by contrast, is not excessive.  Kingsley, 576 U.S. at 397 (citation omitted).

Whether force is reasonable is judged "from the perspective of a reasonable officer on the scene" and must account for "legitimate interests that stem from the government's need to manage the facility in which the individual is detained," including "'policies and practices that in the judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  Id. (cleaned up) (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979)).  Some factors that bear on the reasonableness of force used include "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting."  Id.  Moreover, "de minimis uses of physical force" do not give rise to viable Eighth Amendment claims except where "the use of force is [] of a sort repugnant to the conscience of mankind."  Wilkins v. Gaddy, 559 U.S. 34, 37–38 (2010) (per curiam) (quoting Hudson v. McMillian, 503 U.S. 1, 9–10 (1992)).

Here, the evidence leaves no room for a genuine dispute of fact as to the reasonableness of the ERT members' use of force when they tried to move Floyd out of the Elmwood processing lobby.  At least four aspects of their interaction with Floyd confirm that their use of force was reasonable as a matter of law:

6

1  First, the ERT members clearly sought to minimize their use of force. When Floyd resisted, they did not escalate their use of force; rather, they stopped trying to move him and left him where he was. Fernandes Decl. Ex. B, Ex. C, Ex. D. This "effort made … to temper or to limit the amount of force" indicates that the use of force itself was reasonable. See Kingsley, 576 U.S. at 397.

Second, the ERT members' use of force was tailored to specific safety concerns. For example, Barajas and Cabrera held the back of Floyd's head to prevent him from headbutting other ERT members in the face. Barajas Decl. ¶ 5; Cabrera Decl. ¶ 5; see also Fernandes Decl. Ex. B. Patino held Floyd down by his right shoulder and upper back after Floyd started "thrashing … from side to side." Patino Decl. ¶ 5. Quadros and Serrano-Alvarez held Floyd's arm and wrist so that he could be controlled while being unsecured from his chair. Quadros Decl. ¶ 5; Serrano-Alvarez ¶ 5.[4] And when the ERT members returned a second time, Floyd did not resist, so they did not use force to move him. Floyd Dep. Tr. at 151:16–23. Throughout the ERT members' interactions with Floyd, there was a close "relationship between the need for the use of force and the amount of force used," which indicates that the force used was reasonable. See Kingsley, 576 U.S. at 397.

Third, Floyd's injuries were relatively minor, apparently consisting only of bruises from handcuffs. See Opp. at 5. Even if Floyd's injuries were not de minimis, the lack of severe or lasting injuries supports a conclusion that the amount of force used was not excessive. See Kingsley, 576 U.S. at 397; Wilkins, 559 U.S. at 37–38.

Fourth, Floyd's injuries are directly traceable to his own attempts to resist the ERT members' attempt to move him to his cell. Floyd repeatedly swore at them and physically resisted, making it harder for them to control or move him. Fernandes Decl. Ex. C at 0:27–0:32 ("I'm not gonna fucking relax."), Ex. D at 1:19–1:23 (same); see also Barajas

---

[4] There is no evidence that any of the remaining Defendants against whom Floyd asserts excessive-force claims personally exerted force against him. Floyd identifies no record evidence that would explain why the remaining Defendant should be held liable for actions they did not personally take. See Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation.").

Decl. ¶ 5; Quadros Decl. ¶ 5; Patino Decl. ¶ 5; Evans Decl. ¶ 8; Serrano-Alvarez Decl. ¶ 5; Cabrera Decl. ¶ 5  Floyd himself even acknowledged as much. Floyd Dep. Tr. at 152:18–25 ("I had my handcuffs on as I'm struggling. And yeah, I mean, you get the bruises from the handcuffs."). When the ERT members returned and tried again, Floyd did not resist, the ERT members did not use force, and Floyd did not suffer any injuries. Id. at 151:2–11. Floyd's aggravated response makes Defendants' use of force more likely to be reasonable. See Kingsley, 576 U.S. at 397.

Floyd, for his part, brings forward no evidence to back up his assertion that Defendants' use of force was excessive. Instead, he explains that he resisted because of his difficulty accessing the restroom and desire to use the phone. Floyd Dep. Tr. at 144:8–12; Opp. at 4. That may be so. But whether Floyd had a good reason for resisting does not answer whether Defendants' use of force was excessive or reasonable. The undisputed video evidence shows that it was reasonable, so the Court grants summary judgment with respect to Floyd's excessive force claims.

## B. Denial of Phone Call

Floyd's next claim stems from the fact that he was not given the ability to make a phone call at either the Main Jail or at Elmwood. He raises a due process claim based on a violation of California Penal Code section 851.5, which requires that pretrial detainees be permitted to make three free phone calls "[i]mmediately upon being booked and, except where physically impossible, no later than three hours after arrest." Cal. Penal Code § 851.5(a)(1). The phone calls "shall be given immediately upon request, or as soon as practicable." Id. § 851.5(e). Penal Code section 851.5 creates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Carlo v. City of Chino, 105 F.3d 493, 497–98, 500 (9th Cir. 1997).[5]

Defendants argue that Floyd's failure to request a phone call during the three-hour

---

[5] Floyd also appears to suggest that he has a freestanding Fourteenth Amendment right to use a phone. See Opp. at 6–7 (collecting cases regarding phone communication). The Ninth Circuit rejected this argument in Valdez v. Rosenbaum, 302 F.3d 1039, 1045–48 (9th Cir. 2002), so the Court does not consider it further.

8

window after his arrest defeats his claim because his statutory right to a phone call lapsed three hours after he was arrested. Mot. (dkt. 106) at 14. Floyd was booked at the Main Jail at 11:45 p.m. on August 18, yet he first requested a phone call no earlier than 3:08 a.m. on August 19—more than three hours later. Dundic Decl. ¶ 4; Floyd Dep. Tr. at 95:23–96:16, 97:4–7, 103:21–24.

On first glance, Defendants' reading seems like a reasonable interpretation of Penal Code section 851.5(a)(1), which states in full: "Immediately upon being booked and, except where physically impossible, no later than three hours after arrest, an arrested person has the right to make at least three completed telephone calls … ." Several district courts have interpreted this statute to apply only "within three hours of being arrested." E.g., Adams v. Albertson, 2012 WL 440465, at *9 (N.D. Cal. Feb. 10, 2012); accord Lhevan v. Spitzer, 2022 WL 2892390, at *8 (May 27, 2022); Medrano v. Acosta, 2020 WL 5413384, at *6 (C.D. Cal. Mar. 25, 2020); Hook v. City of Santa Monica, 2006 WL 5309516, at *3 (C.D. Cal. June 7, 2006); McMahon v. County of Santa Barbara, 2016 WL 11758778, at *7 (C.D. Cal. Jan. 8, 2016). But in an unpublished order that predates most of these district court decisions, the Ninth Circuit rejected this argument. Maley v. County of Orange, 224 F. App'x 591, 593 (9th Cir. 2007); see also Golden v. County of Tulare, 2011 WL 1087097, at *3 (E.D. Cal. Mar. 23, 2011) ("The entire tenor of [] section 851.5 is one of liberality to the accused.").

The Court need not decide whether the Ninth Circuit's order (which relies on a California Supreme Court decision interpreting a previous version of Penal Code section 851.5—a version that does not have the three-hour language) or the district courts' orders (which do not squarely address the issue) are more persuasive. The legal uncertainty around the scope of Penal Code § 851.5 in this context means that Defendants are entitled to qualified immunity. See Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (qualified immunity protects government officials who make "mistaken judgments about open legal questions"); Rico v. Ducart, 980 F.3d 1292, 1300–01 (9th Cir. 2020) ("it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of

1  illegality, we can conclude that the law was clearly established on the basis of unpublished
2  decisions only" (citation omitted)).  The individual Defendants are thus entitled to
3  summary judgment.
4    Moreover, even if Penal Code section 851.5 granted Floyd a right to a phone call
5  beyond three hours after his arrest, Defendants were simply obligated to provide him a
6  phone call "as soon as practicable" after he requested one.  Cal. Penal Code § 851.5(e).
7  Though Floyd was denied a phone call for over 10 hours after he first requested one, that
8  delay was largely of his own making given his refusal to dress out in the Elmwood
9  processing lobby.  In fact, Defendants consistently told Floyd that his cooperation would
10 enable him to make a phone call sooner.  See, e.g., Fernandes Decl. Ex. B at 1:23–1:26
11 ("All I want to do is get you to your housing unit and get you that phone call."), 2:05–2:10
12 ("You let us help you, we'll get you to your housing unit, you can use your phone, and we
13 can go from there.").  Defendants' conduct—which is mostly marked by their consistent
14 efforts to move Floyd to his cell, where he would be able to make a phone call—does not
15 so clearly violate Penal Code section 851.5 as to defeat qualified immunity.

16   **C.**  **Restriction of Restroom Access**
17   Floyd's final claim against the individual Defendants is a due process claim arising
18 out of their alleged refusals to allow him to use the restroom.  The Fourteenth Amendment
19 entitles pretrial detainees to "adequate food, clothing, shelter, sanitation, medical care, and
20 personal safety."  Alvarez-Machain v. United States, 107 F.3d 696, 701 (9th Cir. 1996)
21 (citation omitted), overruled on other grounds by John R. Sand & Gravel Co. v. United
22 States, 552 U.S. 130 (2008).  With respect to restroom access, "temporary deprivations …
23 that last only a short amount of time and do not pose a serious threat of harm to the
24 prisoner do not give rise to deprivations that are sufficiently serious to support [a
25 Fourteenth Amendment] claim." Gunn v. Tilton, 2011 WL 1121949, at *3 (E.D. Cal. Mar.
26 23, 2011); see also Hason v. County of Los Angeles, 2012 WL 13123537, at *5 (C.D. Cal.
27 Mar. 13, 2012) (five-hour deprivation of access to toilet facilities "does not violate an
28 inmate's constitutional rights"); Kanick v. Nevada, 2010 WL 2162324, at *1, 5 (D. Nev.

10

Apr. 27, 2010) (denying constitutional claim where the plaintiff had to wait two hours between requesting to use the restroom and being able to do so).

The record indicates that Floyd used the restroom twice while at the Main Jail, see Floyd Dep. Tr. at 100:3–18, and twice at Elmwood, Cote Decl. ¶ 18.[6] Moreover, the evidence does not show that Defendants meaningfully delayed Floyd's access to restrooms. Floyd conceded that he did not have to wait more than five minutes either time he asked to use the restroom at the Main Jail, Floyd Dep. Tr. at 100:3–18, and the first time he used the restroom at Elmwood was within an hour after he arrived there, Cote Decl. ¶¶ 4, 18. And Floyd never involuntarily urinated or defecated outside the restroom. Floyd Dep. Tr. at 124:3–6.

Even if Floyd was denied access to a restroom for some brief window of time while at the Main Jail or Elmwood, any such temporary deprivation fails to rise to the level of a substantive due process violation. See Kanick, 2010 WL 2162324, at *5 ("temporary deprivation of access to toilets, in the absence of physical harm or a serious risk of contamination, … does not amount to anything more than an inconvenience"). Summary judgment is therefore appropriate on Floyd's Fourteenth Amendment claim based on the denial of access to a restroom.

### D. Monell Claim

In addition to his claims against the individual defendants, Floyd asserts a Monell claim against the County of Santa Clara. A Monell claim has four elements: (1) a constitutional deprivation and (2) a government policy, practice, or custom (3) that demonstrates deliberate indifference to the constitutional right at issue and (4) is a

---

[6] Floyd contends that he was denied access to restrooms at Elmwood, relying on two videos as support. But neither creates a genuine dispute of fact. One video shows Floyd several hours after the fact recounting what happened in the processing lobby. Floyd Ex. V3. This is hearsay and inadmissible at summary judgment. Orr, 285 F.3d at 778. The other video, which shows the processing lobby, is unintelligible. Floyd Ex. V5. Floyd's characterization in his briefs of what that video shows is not evidence. See Hill v. PetSmart, Inc., 2022 WL 980269, at *4 (S.D. Tex. Mar. 30, 2022) ("While the Court examines the Parties' characterizations of the evidence in the briefs, the Court also reviews the underlying evidence itself for the purpose of summary judgment."). Cote's declaration that Floyd used the restroom twice at Elmwood is therefore unopposed.

11

"moving force behind the constitutional violation." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011). A Monell claim is not a claim for vicarious liability—the policy, practice, or custom must be tied to the constitutional violation at issue. Id.; see also City of Canton v. Harris, 489 U.S. 378, 385 (1989).

As explained above, Floyd does not show a constitutional deprivation on either his excessive force theory or his restroom access theory. And it is questionable whether he has shown a constitutional deprivation on his phone access theory. It does not matter whether he has, though, as his Monell claim fails on another prong—lack of a policy, practice, or custom.

Floyd fails to bring forth any evidence that would establish that the County of Santa Clara has a policy, practice, or custom of refusing phone calls to prison inmates. He does not identify any official County policy. And though he asserts in his briefing that the County had a "culture" of refusing requests for phone calls, Opp. at 13, his conclusory statement is backed up only by a single lawsuit from over fifteen years ago. That is an insufficient basis for a Monell claim. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (requiring a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"); Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (requiring "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy"). Nor does it matter for purposes of municipal liability that multiple officers were allegedly involved in preventing him from making a phone call. See Jett, 491 U.S. at 737; Trevino, 99 F.3d at 918. Summary judgment on Floyd's Monell claim is therefore appropriate.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of Defendants.

**IT IS SO ORDERED.**

Dated: October 10, 2024



CHARLES R. BREYER
United States District Judge